# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM A. "SPOOK" SPANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:14-cv-1267 |
| v. | ) | Judge Sharp |
| | ) | |
| ED CARTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the Court are two Motions to Dismiss the Amended Complaint, one filed by Defendants who are officers of the Tennessee Wildlife Resource Agency, Ed Carter, Mitchell Bailey, Dale Grandstaff, Brad Jackson, and Shawn Karns (Docket No. 46), and the other filed by Defendant Thomas Southerland (Docket No. 48). For the reasons that follow, both Motions will be granted.

## I. Factual Background

Plaintiff William A. "Spook" Spann, a resident of Tennessee, is a professional hunter and host of the Pursuit Channel's television program "Spook Nation." He brings suit under 42 U.S.C. § 1983, claiming officials and agents of the Tennessee Wildlife Resource Agency (the "TWRA Defendants") and Plaintiff's former cameraman, Defendant Thomas Southerland, violated his rights under the United States and Tennessee Constitutions.

The TWRA Defendants are Executive Director Ed Carter, Agent/Warden Mitchell Bailey, Sergeant Dale Grandstaff, and Agents Shawn Karns and Brad Jackson. Plaintiff's Amended Complaint also names "John Does 1-10" who are "agents, officers, and others who

have assisted the TWRA under color of state law yet [*sic*] while in their individual capacities and the named Defendants herein in violating Mr. Spann's constitutional rights."   (Docket No. 21-1 at 3).   Plaintiff asserts that although the TWRA is a "rogue agency" that has spent "countless man hours pursuing Mr. Spann, terrorizing his family, threatening his family, invading his privacy and converting and destroying his property," it holds sovereign immunity and thus, is not a party to this lawsuit.   (Id. at 4).

The following facts are alleged in the Amended Complaint.   In 2007, Plaintiff purchased two adjacent farms in Stafford, Kansas, where he had hunted for some years, and pursued a lease agreement (to be completed in 2008) for a third neighboring property.   He acquired the properties for the purpose of hunting.   In November of that year, he entered the leased property to scout for deer and erect a tree stand.   While there, he saw a "monster buck and successfully stalked and harvested it."   (Docket No. 21-1 at 5).   The hunt was captured on film and later featured in two hunting magazines, but Plaintiff's then-cameraman was not credited for the footage.   The cameraman (unnamed in the Amended Complaint), allegedly a friend of Defendant Grandstaff, resigned in protest.   Plaintiff later heard that the cameraman planned to ruin his hunting career.

Over two years later, in early 2011, TWRA officers questioned Defendant Southerland, Plaintiff's subsequent cameraman, in order to obtain the footage of the "monster buck" shot in 2007.   Officers then seized the buck's rack from Plaintiff's house.   He was charged in a Kansas federal district court with "harvesting the 2007 Kansas buck with the wrong hunting license and violating the federal Lacey Act for transporting the buck from Kansas to his primary residence in Tennessee."   (Id. at 6).   In February 2013, Plaintiff pleaded guilty to a reduced

charge: a misdemeanor for unlawful transportation of the illegally hunted buck. As a condition of his probation, he was prohibited from hunting anywhere in the United States for six months.

Plaintiff asserts that, in March 2013, Defendant Southerland gave two-week notice of his resignation and was "enlisted by his best friend, Mitchell Bailey, a TWRA officer, and Defendant, Dale Grandstaff, to work undercover to set up his boss for a probation violation during spring turkey season." (Id. at 6). To that end, Defendants "set up several cameras on three of Mr. Spann's private farms without search warrants and without a basis to obtain search warrants." (Id.). At some later point, animal feed was scattered on the ground in view of the cameras, though it is unclear from the record whether Defendants were responsible, or whether the bait was set by Plaintiff or Defendant Southerland at Plaintiff's direction. Plaintiff notes he had "an expectation of privacy on these properties and had not consented to these cameras or the Defendants' trespassing on his property." (Id.).

In June 2013, Plaintiff's probation officer filed a petition with the court in Kansas alleging Plaintiff had violated his probation by: "(1) hunting; and (2) committing a state crime, specifically, violating Tennessee law by 'baiting' fields within ten days of hunting turkeys." (Docket 49-2 at 5). In the subsequent probation violation hearing, the court found that agents of the TWRA and United States Fish and Wildlife Service had opened an investigation of Plaintiff's activities during the spring 2013 hunting season and placed "numerous surveillance cameras on three parcels of land which Mr. Spann owned or at least had rights of access to for hunting purposes." (Docket No. 49-2 at 6). The court also found that, over the following months, the cameras captured Plaintiff accompanying other hunters and participating to a degree that constituted "hunting" in violation of his probation. This included "dressing in camouflage and

other hunting equipment in order to pursue animals for himself or others to kill."    (Id. at 20-21).

Based on these determinations, the court extended Plaintiff's probation until February 28, 2016, and prohibited him from hunting for an additional year.    (Id. at 28).    Plaintiff contends the court's findings were "based in large part on the false testimony of Defendant, Thomas Southerland."    (Docket No. 21-1 at 8).

The Amended Complaint references a number of other incidents to illustrate the "ongoing harassment" that Plaintiff and his family allegedly received at the hands of Defendants.    TWRA agents were repeatedly seen on streets near Plaintiff's home and at least once near his father's home.    They questioned Plaintiff's hunting acquaintances.    Plaintiff also heard from an unspecified source that TWRA agents cited him as an example of poor hunting ethics in hunter safety courses.

Plaintiff offers more specific examples of alleged harassment as well.    For instance, an anonymous caller reported a gun in Plaintiff's son's truck while he was at school.    Plaintiff's son, a member of the school's rifle team, was arrested and suspended.    Plaintiff believes the informant was "one of these named Defendants or their agents."    (Id. at 7).    The criminal case against Plaintiff's son was later dismissed.

In June 2013, TWRA agents, including Defendants Karns and Jackson, raided the home of Jason Dotson, Plaintiff's current cameraman, and "seized all computers, childrens [*sic*] electronics, cameras and footage, severely damaging Mr. Spann's ability to make a living." (Id.).    Defendants also seized property belonging to Plaintiff from a taxidermy shop.

The following month, TWRA officers served Plaintiff with a search warrant for his cellular phone.    Plaintiff claimed not to have the phone and the officers did not search his home

at that time.   However, they returned on February 21, 2014, with another search warrant for the same phone.   During the subsequent search, Plaintiff claims his property was damaged.   He was arrested and charged with tampering with evidence and insurance fraud, as was his wife, Marty Spann.   Mrs. Spann was escorted out of the school where she worked as a guidance counselor and handcuffed in the parking lot.   Plaintiff alleges she was jailed for several hours while the district attorney present and two TWRA officers, including Defendant Karns, "attempted to coerce her to testify against her husband" and "refused to allow her attorney access" to her.   (Id. at 9).

The Amended Complaint concludes these instances amount to "constant and unreasonable surveillance" of Plaintiff and his family, conducted "without a basis other than to exact unlawful penalties on him and to harm his ability to make a living as a hunter," in violation of Plaintiff's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments.   (Id. at 10-11).

## II. <u>Legal Analysis</u>

As a general rule, in considering a motion to dismiss under Federal Rule of Civil Procedure 12(b), a court must take "all well-pleaded material allegations of the pleadings" as true.   <u>Fritz v. Charter Township of Comstock</u>, 592 F.3d 718, 722 (6th Cir. 2010).   The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible."   <u>Id</u>. (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009)).   "'A legal conclusion couched as a factual allegation,'" however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action

sufficient." Id. (quoting Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, in determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." Ley v. Visteon Corp., 543 F.3d 801, 805 (6th Cir. 2008) (citation omitted).

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law. Anyone whose conduct is 'fairly attributable to the state can be sued as a state actor under § 1983.'" United Pet Supply, Inc. v. City of Chattanooga, Tenn., 768 F.3d 464, 478 (6th Cir. 2014) (quoting Filarsky v. Delia, 132 S.Ct. 1657, 1661 (2012)); see also Burnett v. Grattan, 468 U.S. 42, 45 n. 3 (1984). A plaintiff who asserts a cause of action under § 1983 must allege two elements: (1) the deprivation of a right secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. 42 U.S.C. § 1983; Jones v. Duncan, 840 F.2d 359, 360-61 (6th Cir. 1988).

In this case, Plaintiff fails to establish a cause of action under § 1983. The Amended Complaint offers only vague invocations of the Fourth, Fifth, and Fourteenth Amendments, leaving the Court to fully articulate each Amendment's protections and apply them to the corresponding facts. Despite the Court's efforts to elucidate the specifics of these claims, the facts alleged, even when viewed in the light most favorable to Plaintiff, fail to show Plaintiff has been deprived of a constitutional right.

As a preliminary matter, the Court notes that Plaintiff's claims may be time-barred, as

many of the pertinent events occurred over a year before the filing of the original Complaint on June 5, 2014. "Congress did not enact a statute of limitations for actions brought under 1983; thus, it is the duty of federal courts to apply the state statute of limitations most analogous to the asserted claim." Dunn v. Tenn., 697 F.2d 121, 126 (6th Cir. 1982) (citing Johnson v. Ry. Express Agency, Inc., 489 F.2d 525, 529 (6th Cir. 1973), aff'g, 421 U.S. 454 (1975)). In this case, the relevant statute provides a one-year limitations period for "[c]ivil actions for compensatory or punitive damages, or both, brought under the federal civil rights states." TENN. CODE ANN. § 28-3-104(a)(3). The Amended Complaint describes many events beginning in 2007, including the seizure of the "monster buck" rack from Plaintiff's home in 2011 and the placement of surveillance cameras on his farms in spring 2013, that occured outside of the one-year limitations period.

Plaintiff contends that the limitations period must be measured from when he knew or should have known of his injury, specifically, the presence of the cameras on his property. To this end, he has filed a declaration testifying that he first learned that TRWA agents had installed the cameras at his probation revocation hearing on June 28, 2013, thereby bringing his Fourth Amendment claim just within the limitations period. (Docket No. 26).

When viewed in light of the entire record, Plaintiff's declaration elicits some skepticism. At the June 28, 2013 probation revocation hearing, Plaintiff exhibited photos of himself managing mineral licks around the locations where the cameras had been placed (providing an alternative to the Government's explanation for his presence on camera, to wit, that he was spreading feed to illegally bait turkeys). Plaintiff testified that he had taken the photos at the request of his attorney after he "saw the government's evidence." (Docket No. 46-2 at 13).

On cross-examination, Plaintiff repeated this admission:

> Q: Let me talk to you about the photographs that are the defense exhibits. It sounds like you acknowledge that all of these photographs … were all reenactments, aren't they? These were all taken after you had received the government's evidence, correct?
>
> A: They were taken after I found out – yeah.
>
> Q: Okay. And so all were taken at a time when you knew what the government's evidence would be and these are all in response to the government's evidence to try and show that it's a salt lick and not feed that our evidence shows –
>
> A: Correct.

(Id. at 5-6).

This testimony indicates Plaintiff knew of the facts giving rise to his Fourth Amendment claim some time prior to June 28, 2013. It is highly unlikely that he received the government's evidence (the video footage), consulted with his lawyer to formulate a response, and took the photographs that he offered as evidence to refute the government's allegations all on the day of the hearing. Thus, the clock on the limitations period very likely started to run before June 28. If Plaintiff learned of the cameras prior to June 5, 2013, his Fourth Amendment claim is indeed time barred. However, even if Plaintiff's claim does not run afoul of the statute of limitations, he has nonetheless failed to fulfil his minimal burden at the dismissal phase, as set forth below.

### A. Fifth and Fourteenth Amendment Claims

The Amended Complaint makes only one explicit allegation of a Fifth Amendment violation: "Plaintiff avers that the false testimony of Defendant, Southerland, which was suborned and fostered by the other Defendants with the knowledge that his testimony was false, constitutes a violation of the Fifth Amendment." (Docket No. 21-1 at 12). Plaintiff acknowledges this "is not actionable as a basis for a cause of action" but contends "it is

indicative of the unlawful actions and behavior of the Defendants and the degree to which they will go in their individual capacities to violate the Plaintiff's constitutional rights and to harm him as part of their illegal covin [*sic*] and conspiracy." (Id.). As Plaintiff apparently agrees that this argument raises no viable cause of action, it need only be treated briefly.

It is well-settled that "[t]he Fifth and Fourteenth Amendments apply to actions of the federal and state governments respectively." Newsom v. Vanderbilt Univ., 653 F.2d 1100, 1113 (6th Cir. 1981); see also, Myers v. Village of Alger, Oh., 102 Fed. Appx. 931, 933 (6th Cir. 2004) ("[T]he Fifth Amendment applies to the federal government, not state or local governments such as [defendant].").  Thus, the alleged violation of Fifth Amendment rights, when perpetrated by state or local governments, is evaluated under the Fourteenth Amendment. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005) (regarding the Takings Clause) (citation omitted); Center for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011) (regarding the Equal Protection Clause) (citation omitted); Bybee v. City of Paducah, 46 Fed. Appx. 735, 737-38 (6th Cir. 2002) (regarding the Due Process Clause) (citation omitted). Because Plaintiff's claims under § 1983 are directed at Defendants who are or were employees of State government (or in Mr. Southerland's case, an individual allegedly acting with them), the Fifth Amendment is not the proper source of Plaintiff's federal rights and cannot satisfy the first element of his prima facie claim.

The Parties' filings briefly touch on the Fifth Amendment's Takings Clause, which precludes the taking of private property for public use without just compensation. It is first mentioned in TWRA Defendants' Motion to Dismiss. There, grasping to anticipate the specifics of Plaintiff's Fifth Amendment claim, Defendants identify the Takings Clause and the

Due Process Clause as "the only possible provisions under which the [Plaintiff's Fifth Amendment] claim could proceed." (Docket No. 47 at 5-6). A claim for unconstitutional taking is not ripe, Defendants contend, because Plaintiff has not yet utilized State procedures to pursue compensation. Plaintiff addresses the Taking Clause for the first time in his Response to Defendants' Motion to Dismiss, where he responds that "§ 1983 contains no exhaustion requirement beyond what Congress has provided." (Docket No. 54 at 2).

The Court finds this debate unnecessary. Plaintiff must establish two elements for an unconstitutional taking claim: (1) the Government "took [his] property," and (2) either "failed to compensate [him] justly or failed to put the property to public use." Prater v. City of Burnside, Ky., 289 F.3d 417, 425 (2002) (citing Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987)). "A federal court may hear a takings claim only after: (1) the plaintiff has received a 'final decision' from the relevant government actor; and (2) the plaintiff has sought 'compensation through the procedures the State has provided for doing so.'" Wilkins v. Daniels, 744 F.3d 409, 417 (6th Cir. 2014) (citing Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985)).

Plaintiff fails to set forth the elements of a Takings Clause claim despite the lenient pleading standard of Rule 8. See FED. R. CIV. P. 8(a)(2). Furthermore, "it is well-established that new arguments may not be raised for the first time in a reply brief." Edkins v. United States, 2015 WL 871587 at *7 (E.D. Mich. Feb. 27, 2015) (citing United States v. Rhodes, 1997 WL 123754 at *1 (6th Cir. March 18, 1997)). Plaintiff failed to raise the issue of unconstitutional taking until his Response to Defendants' Motion to Dismiss, and therefore, the Court need not consider it further. See Boddy v. Astec, Inc., 2012 WL 5507298 at *12 (E.D.

Tenn. Nov. 13, 2012) (declining to consider an argument regarding temporal proximity in a retaliation claim because plaintiff first raised the matter in response to a motion for summary judgment).

In similar fashion, Plaintiff's Fourteenth Amendment claim is treated in the Amended Complaint with only passing reference. The general allegations of harassment (e.g., TWRA agents cited Plaintiff as an example of poor hunting ethics, frequented his neighborhood, questioned his acquaintances, etc.) are not sufficiently articulated as to render a Fourteenth Amendment claim plausible. See Ashcroft, 556 U.S. at 676. Moreover, Plaintiff lacks standing to assert the legal rights and interests of third parties; alleged harassment of his son and wife by Defendants do not further his claim. See Warth v. Seldin, 422 U.S. 490, 514 (1975) (concluding it is "inappropriate to allow [plaintiff] to invoke the judicial process" in "an attempt to raise putative rights of third parties."); Claybrook v. Birchwell, 199 F.3d 350, 357 (6th Cir. 2000) ("In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort.") (citation omitted).

The Court agrees with Defendants' observation that "Plaintiff's entire claim is based on alleged unreasonable search and seizure." (Docket No. 47 at 7). Thus, the Fourteenth Amendment is relevant to this analysis only insofar as its Due Process Clause applies the privacy protections of the Fourth Amendment to the States. See Mapp v. Ohio, 367 U.S. 643, 656 (1961); Fox v. Van Oosterum, 176 F.3d 342, 349 n. 3 (6th Cir. 1999). And even here, its application is limited. "Where a plaintiff's claims under the Fourteenth Amendment arise out of a common nucleus of facts and pertain to an alleged wrongful search or seizure, it is appropriate to analyze such claims under the reasonableness standard of the Fourth Amendment

11

instead of an analysis of substantive due process rights." <u>Arbuckle v. City of Chattanooga</u>, 696 F. Supp. 2d 907, 922-23 (E.D. Tenn. 2010) (citation omitted); <u>see also</u> <u>United States v. Lanier</u>, 520 U.S. 259, 272 n. 7 (1997) ([I]f a constitutional claim is covered by a specific constitutional provision … the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). Therefore, Plaintiff's claim is properly treated with reference to the Fourth Amendment.

### B. Fourth Amendment Claim

The Fourth Amendment provides that:

> The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. "A 'search' occurs for the purposes of the Fourth Amendment when the government invades an individual's reasonable expectation of privacy." <u>United States v. Anderson-Bagshaw</u>, 509 Fed. Appx. 396, 402 (6th Cir. 2012) (citing <u>Smith v. Md.</u>, 442 U.S. 735, 739-40 (1979)). The determination of reasonableness involves both a subjective and objective component: (1) "'the individual [has] manifested a subjective expectation of privacy in the object of the challenged search' and (2) 'society [is] willing to recognize that expectation as reasonable.'" <u>Taylor v. Michigan Dept. of Natural Res.</u>, 502 F.3d 452, 455 (6th Cir. 2007) (quoting <u>Cal. v. Ciraolo</u>, 476 U.S. 207, 211 (1986)). Both components must be satisfied to garner the protections of the Fourth Amendment.

#### i. *Surveillance of Plaintiff's farms*

While an individual's reasonable expectation of privacy extends to the "curtilage," or the area immediately surrounding his or her home, <u>Daughenbaugh v. City of Tiffin</u>, 150 F.3d 594,

598 (6th Cir. 1998), "an individual may not legitimately demand privacy for activities conducted out of doors in fields." Oliver v. United States, 466 U.S. 170, 178 (1984). This limitation on the privacy protections of the Fourth Amendment, the so-called "open fields doctrine,"[1] recognizes that "unoccupied or undeveloped areas" outside of a home's curtilage "do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." Id. at 179 & 180 n.11. Therefore, "'there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields.'" Widgren v. Maple Grove Twp., 429 F.3d 575, 579 (6th Cir. 2009) (quoting United States v. Dunn, 480 U.S. 294, 304 (1987)).

Plaintiff claims that Defendants violated his Fourth Amendment rights when they installed surveillance cameras on his "private farms without search warrants and without a basis to obtain search warrants," as he "had an expectation of privacy on these properties and had not consented to these cameras or the Defendants' trespassing on his property." (Docket No. 21-1 at 6). Defendants respond that the farms are not curtilage but rather "open fields" outside the sphere of Fourth Amendment protection.

The determination of what constitutes curtilage is decided "based on the unique facts of each case." Anderson-Bagshaw, 509 Fed. Appx. at 403 (citing Daughenbaugh, 150 F.3d at 598). To aid in this inquiry, the Court looks to the following factors: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken

---

[1] The open fields doctrine, first articulated by the Supreme Court in Hester v. United States, 265 U.S. 57 (1924), is somewhat of a misnomer, as "it may include any unoccupied or undeveloped area outside of the curtilage." Oliver, 466 U.S. at 180 n. 11. "An open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example … a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." Id.

by the resident to protect the area from observation by people passing." <u>Dunn</u>, 480 at 301 (citation omitted). However, the Supreme Court has cautioned that these factors are not "a finely tuned formula," and should be used "only to the degree that … they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." <u>Id</u>. For most homes, "the boundaries of the curtilage will be clearly marked; and the conception of defining the curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience." <u>Oliver</u>, 466 U.S. at 182 n. 12.

While a home's backyard is routinely classified as curtilage, the same cannot be said of agricultural space, even when located near the home. <u>See e.g.</u>, <u>Anderson-Bagshaw</u>, 509 Fed. Appx. at 403-04 (declining to apply the four factors because barnyard and pasture areas were "without a doubt" open fields outside the curtilage of plaintiff's home and therefore video surveillance of these areas did not constitute unreasonable search); <u>United States v. Hoskins</u>, 735 F.2d 1006, 1007-08 (6th Cir. 1984) (garden plot one-hundred yards from defendant's home in which he grew marijuana plants constituted an open field); <u>see also</u> <u>United States v. Vankesteren</u>, 553 F.3d 286, 292 (4th Cir. 2009) (placement of surveillance cameras by game agents on farmer's field did not constitute unreasonable search).

In this case, the first factor – proximity of the three farms to the home – is not stated specifically in the record. However, the farms are presumably far enough from Plaintiff's residence to maintain a safe distance between hunters and others, and sufficiently remote to draw wildlife. As for the second factor, there is no indication that the three farms fall within a single enclosure surrounding the home. Third, the primary use of the area appears to be hunting, not

an activity "intimately tied to the home."   <u>Dunn</u>, 480 U.S. at 301.   Regarding the fourth factor, Defendants argue Plaintiff does not protect the farms from observation, as he routinely films his television show there and also escorts guests on the properties to hunt.   Plaintiff responds that the film editing process allows him to select what portions of his property and activities he shares with the public on his television show and, in this way, he does protect the farms from observation to some degree.   While the fourth factor may be inconclusive, when taken together, the factors indicate that Plaintiff's farms are properly classified as open fields.

This conclusion is validated by looking to the "centrally relevant consideration" of this inquiry.   <u>Dunn</u>, 480 at 301.   The Court is sympathetic to the concerns presented by extended camera surveillance; nevertheless, the facts of this case do not indicate an infringement of Plaintiff's privacy rights.   As eloquently articulated by the Fourth Circuit,

> The idea of a video camera constantly recording activities on one's property is undoubtedly unsettling to some.   Individuals might engage in any number of intimate activities on their wooded property or open field – from romantic trysts under a moonlit sky to relieving oneself … – and do so under the belief that they are not being observed.   But the protection of the Fourth Amendment is not predicated upon these subjective beliefs.

<u>Vankesteren</u>, 553 F.3d at 291.   Likewise, the Court finds that a subjective expectation of privacy on the farms is not objectively reasonable.   The record indicates the farms are used primarily for hunting and for filming Plaintiff's television show – a far cry from the "intimate activity associated with the sanctity of a man's home."   <u>Dunn</u>, 480 U.S. at 300.   Moreover, even extended surveillance of the farms would not yield the type of intimate and detailed information that is "in the aggregate, so comprehensive" as to implicate privacy concerns, as in the context of long-term tracking via GPS or cellular telephone.   <u>See</u> <u>United States v. Jones</u>, 132 S.Ct. 945, 955 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise,

comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."); United States v. Powell, 943 F. Supp. 2d 759, 776 (E.D. Mich. 2013) (noting the presence of Fourth Amendment concerns "in long-term, real-time tracking of an individual's movements via his or her cell phone").

Defendants' alleged trespass on the farms to erect the cameras does not affect this conclusion. "In the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." Widgren, 429 F.3d at 579-80 (citing Oliver, 466 U.S. at 183-84); see also United States v. Elkins, 300 F.3d 638, 654 (6th Cir. 2002) ("[T]his court has recognized that the presence of a no-trespassing sign cannot confer curtilage status on an area that otherwise lacks it.") (citation omitted).

ii.     *Searches of Plaintiff's home*

Unlike open fields, a search of the home is not reasonably conducted absent a search warrant. See Payton v. N.Y., 445 U.S. 573, 590 (1980) ("The Fourth Amendment has drawn a firm line at the entrance of the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). A search warrant may be executed only upon a showing of probable cause, meaning there is a "fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Houston, 597 Fed. Appx. 382, 383 (6th Cir. 2015) (citing United States v. Williams, 544 F.3d 683, 686 (6th Cir. 2008)). By delegating the probable cause determination to a neutral judicial officer, the warrant requirement protects "an individual's interest in the privacy of his home against the unjustified intrusion of

the police." <u>Steagald v. United States</u>, 451 U.S. 204, 213 (1981).

"Because probable cause to search is concerned with facts relating to a presently existing condition, there arises the unique problem of whether the probable cause which once existed has grown stale." <u>United States v. Spikes</u>, 158 F.3d 913, 923 (1998) (citations and internal quotation marks omitted). This determination is made based on the unique circumstances of each case and is not intended to "create an arbitrary time limitation within which discovered facts must be presented to the magistrate." <u>Id.</u> (citing <u>United States v. Henson</u>, 848 F.2d 1374, 1382 (6th Cir. 1988); <u>Sgro v. United States</u>, 287 U.S. 206, 210-11 (1932)). Time is a "key but by no means controlling issue." <u>United States v. Leaster</u>, 35 Fed. Appx. 402, 406 (6th Cir. 2002). The Court also considers such variables as: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc." <u>Spikes</u>, 158 F.3d at 923 (citation and internal quotation marks omitted).

Plaintiff alleges the search of his residence in February 2014 was unreasonable because the warrant authorizing the search was based on stale information and thus lacked probable cause.[2] In fact, two warrants were executed and both are filed as exhibits in TWRA Defendants' Motion to Dismiss. (Docket Nos. 46-4 & 46-6).

The first warrant, which Plaintiff does not contest, was executed on June 14, 2013. It

---

[2] Plaintiff further alleges that TWRA agents exceeded the scope of the February 2014 search warrant, which he contends allowed for only "precise location information" on the cellular phone "from 18:00 pm (CST) on February 20, 2014 through 6:00 (CST) February 22, 2014," when Defendants in fact "collected information from Mr. Spann's cell phone for June 6 and June 7, 2013." (Docket No. 21-1 at 12). However, the Court fails to locate any such language in the text of the February 20 search warrant, which instead sets forth the broad search parameters detailed *infra*, or in any other document exhibited by the Parties. Plaintiff provides no citation for the quoted material to address the confusion. The June 2013 warrant does authorize the collection of information associated with Plaintiff's cellular telephone between June 6 and 7. (Docket No. 46-6 at 1).

authorized a search of Verizon Wireless for "subscriber information and all stored electronic communications" relating to two cellular telephone numbers associated with Plaintiff "between 12:01 AM on 06/06/2013 and 11:59 PM on 06/07/2013." (Docket No. 46-6). Agents sought information relating to the two numbers – one Plaintiff's original cellular telephone number, the other associated with a pre-paid cellular telephone obtained after he was questioned on June 6, 2013 – on the belief devices associated with the numbers contained evidence Plaintiff had violated wildlife and hunting laws. Plaintiff subsequently filed an insurance claim on the original cellular telephone, declaring it lost. On February 20, 2014, he and his wife were indicted by a grand jury on counts of tampering with or fabricating evidence and filing a false or fraudulent insurance claim. (Docket No. 46-5).

The second search warrant was executed on February 21, a day after the indictment. It authorized a search of Plaintiff's residence, property, and vehicles for "[a]ny item which tends to memorialize the loss, acquisition, deactivation, activation, location or replacement" of cellular phones associated with Plaintiff's original number, the pre-paid cellular telephone number, and Plaintiff's wife's number from June 6, 2013 to present. (Id. at 2). Specifically, the warrant authorized the collection of any cellular phones associated with the three numbers, other electronic devices, and a wide array of documents associated with accounts and insurance claims filed for Plaintiff's original cellular telephone during the time in question. The affidavit establishing probable cause focused largely on events occurring on June 6 and 7, and no later than June 28, 2013. The warrant appears lawfully signed and there is no evidence in the record to indicate it contains false information.

First, the Court notes that an eight-month delay between the events set forth in the

affidavit and the execution of the search warrant is "well within the expiration date approved by courts." United States v. Vanderweele, 545 Fed. Appx. 465, 469-70 (6th Cir. 2013) (deeming informant's statements regarding defendant's possession of a silencer "fresh" though they were communicated up to seven months prior to execution of search warrant). See also United States v. Lancaster, 145 Fed. Appx. 508, 513 (6th Cir. 2005) (holding information identifying defendant as having fired a machine gun two years prior was not stale); United States v. Batchelder, 824 F.2d 563 (7th Cir. 1987) (holding information from nine months prior that defendant received a silencer was not stale).

Second, when applied to the facts of this case, the four staleness variables weigh against Plaintiff's argument, due in large part to the nature of the items sought in the warrant. "In the context of drug crimes, information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'" United States v. Brooks, 594 F.3d 488, 493 (6th Cir. 2010) (quoting United States v. Frechette, 583 F.3d 374, 378 (6th Cir. 2009)). However, outside of that context, courts have found probable cause endures for considerable periods of time. See e.g., Frechette, 583 F.3d at 381 (finding probable cause for a search warrant fifteen months after defendant paid for a subscription to a website containing child pornography); United States v. Abboud, 438 F.3d 554, 574 (6th Cir. 2006) ("business records are a type of evidence that defy claims of staleness"); United States v. Hazel, 2013 WL 4007988 at *5 (S.D. Oh. Aug. 5, 2013) (finding two-year period before issuance of warrant did not render the information stale, as "[t]he alleged crimes, fraud and conspiracy, are generally carried out over a long period of time"). During the time period at issue, Plaintiff remained "entrenched" at his residence, the location of the search. And, as noted above, the items to be seized were likely to remain in Plaintiff's

possession and were not perishable. Thus, the Court is satisfied probable cause existed for the warrant executed in February 2014.

Finally, even if the information were stale, Plaintiff's claim would fail in light of the doctrine articulated in United States v. Leon, 468 U.S. 897 (1984). There, the Supreme Court confined its inquiry regarding a subsequently invalidated search warrant to "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n. 23. When reviewing the probable cause determination of a magistrate judge, the Court affords great deference and confines its examination to the four corners of the affidavit. See Frechette, 583 F.3d at 379. Here, even if probable cause was stale, Plaintiff has offered no evidence that a reasonably trained officer would have known the warrant was deficient despite the authorization of the issuing judge.

### C. Qualified Immunity

For the sake of completeness, the Court notes that even if the surveillance of Plaintiff's farms or search of his residence were unreasonable, Defendants would be protected from liability by qualified immunity. Qualified immunity is an affirmative defense that shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citation omitted). Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, whether the right infringed was clearly established. Saucier v. Katz, 533 U.S. 194, 202 (2001); McKinley v. City of Mansfield, 404

F.3d 418, 429-30 (6th Cir. 2005).[3]

For a right to be "clearly established," it need not be specifically announced by the Supreme Court or the Sixth Circuit. Instead, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir. 2002) (citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Wilson v. Layne, 526 U.S. 603, 615 (1999). A public official could "still be on notice that [his] conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

In this case, given the highly individual nature of the curtilage determination, Defendants cannot be said to have violated a "clearly established right" when they determined Plaintiff's farms were open fields and conducted a search accordingly. See Daughenbaugh, 150 F.3d at 602-04 (explaining that "the law defining curtilage remains unclear," therefore, once officers determined that a plaintiff's garage was not curtilage, their search was not objectively unreasonable). Nor did the search of Plaintiff's residence violate a "clearly established right" when TWRA agents acted pursuant to a facially valid search warrant.

---

[3] While this sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

**D. Claims against Defendant Southerland**

"[T]he protections afforded to citizens by the Fourth and Fourteenth Amendments apply only to state or government action." Daniels v. Charter One Bank, 39 Fed. Appx. 223, 225 (6th Cir. 2002). Moreover, for the purposes of § 1983, defendants must have acted "under color of state law," meaning as state actors or as private parties that either "perform fundamentally public functions" or "jointly participate with a state to engage in concerted activity." Bartell v. Lohiser, 215 F.3d 550, 556 (6th Cir. 2000).

A private party does not act as a state agent merely because "there was some antecedent contact between that person and the police." United States v. Lambert, 771 F.2d 83, 89 (6th Cir. 1985) (citing United States v. Coleman, 628 F.2d 961, 965 (6th Cir. 1980)). Instead, to bring a private party's search within the scope of the Fourth Amendment, Plaintiff must show that: (1) TWRA agents "instigated, encouraged or participated in the search" and (2) Defendant Southerland "engaged in the search with the intent of assisting the police in their investigative efforts." (Id.) (citing United States v. Howard, 752 F.2d 220, 227 (6th Cir. 1985), vacated on other grounds, 770 F.2d 57, 62 (6th Cir. 1985)).

Having concluded the search of Plaintiff's farms and residence was reasonable within the meaning of the Fourth Amendment, the Court need not delve far into this inquiry. See Relford v. Lexington-Fayette Urban Cnty. Govt., 390 F.3d 452, 458 (6th Cir. 2004) ("The Fourth Amendment does not preclude all searches that are attributable to the government, only those that are unreasonable.") (citation omitted). It is sufficient simply to note that because Plaintiff has failed to show a violation of any constitutional right, there is no unlawful "concerted activity" in which Defendant Southerland could have engaged. Finally, even if Defendant

Southerland did act as a state agent for the purposes of § 1983 and, in so doing, had participated in an unlawful search with TWRA agents, he would also be protected by qualified immunity.

### III. <u>Conclusion</u>

Based on the reasoning set forth above, Defendants' Motions to Dismiss will be granted. An appropriate order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE